IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2019

IN RE SERENITY S. ET AL.

Appeal from the Juvenile Court for Anderson County
Nos. J33113, J34028, J34029, J34030     Brian J. Hunt, Judge

No. E2019-00277-COA-R3-PT

This is a termination of parental rights case, focusing on Serenity S., Hezeki S., Azaiah W., and Lyriq S., the minor children ("the Children") of Angela W. ("Mother") and William S. ("Father"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on March 30, 2017, upon investigation into allegations of environmental and educational neglect. The Anderson County Juvenile Court ("trial court") subsequently adjudicated the Children dependent and neglected as to both parents on May 23, 2017. On July 11, 2018, DCS filed a petition to terminate the parental rights of Mother and Father to the Children. Following a bench trial, the trial court granted the petition as to both parents in an order entered on January 18, 2019.[1] As pertinent to this appeal, the trial court found that statutory grounds existed to terminate Mother's parental rights upon its finding by clear and convincing evidence that (1) Mother had abandoned the Children by failing to visit them, (2) Mother had failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans, (3) the conditions leading to the Children's removal from Mother's home persisted, and (4) Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Mother has appealed. Discerning no reversible error, we affirm the trial court's judgment terminating Mother's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

---

[1] Father has not appealed the termination of his parental rights to the Children. We will therefore confine our analysis to those facts relevant to Mother's appeal.

Keri E. Rule, Knoxville, Tennessee, for the appellant, Angela W.

Herbert H. Slatery, III, Attorney General and Reporter, and Matt D. Cloutier, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

Upon DCS's petition, the trial court initially entered an "Order Controlling Conduct and for Protective Supervision" on March 27, 2017, bringing the Children into protective custody and requiring the parents to comply with a non-custodial permanency plan. At the time, Father was incarcerated, and Mother was residing with the Children in a rented home. Following a hearing, the Children were removed from Mother's home pursuant to an order entered by the trial court on March 30, 2017. The trial court found in this order that probable cause existed to determine that the Children were dependent and neglected in that they "suffer[ed] from environmental neglect and truancy." At the time, Serenity was seven years of age, Hezeki was six, Azaiah was nearly three, and Lyriq was nearly two.

On May 23, 2017, the trial court entered an order adjudicating the Children dependent and neglected upon the parents' respective waivers of an adjudicatory hearing, the "unavailability of father due to his incarceration at time of removal," and Mother's stipulation to "environmental neglect in the home" pursuant to Tennessee Code Annotated § 37-1-102(b)(13)(A) and (F). In this order, presented by DCS as an exhibit during the termination trial, the court expressly found that DCS had made reasonable efforts to prevent the Children's removal from the home.

From the time of their removal into protective custody through the time of the termination trial, Serenity, Azaiah, and Lyriq resided together in a foster home with K.M. as their foster mother ("Foster Mother"). Leah Baird, the DCS Family Services Worker assigned to the case, testified during trial that Hezeki was placed separately due to his special needs in a residential treatment facility, located in Columbia, Tennessee. It is undisputed that upon Hezeki's diagnosis of autism, he was placed in a program for autistic children on April 5, 2017, a few days after the Children's removal from Mother's home.

Prior to filing the petition for termination of parental rights, DCS developed four permanency plans for the Children and the parents. All four plans were presented as exhibits during the termination proceedings. The first permanency plan was established

on April 17, 2017, and ratified by the trial court on May 23, 2017. The court's order ratifying the plan indicated that Mother and her counsel were present for the permanency plan hearing and that the court reviewed with Mother the statutory definition of abandonment. The court found in its order ratifying the initial plan that the placements of the Children were "safe and appropriate and in the [Children's] best interest." The court also found that the stated goal of the plan to "Return to Parent" was appropriate and in the Children's best interest at that time. Additionally, the court found that the parents' responsibilities set forth in the plan were "reasonable, related to remedying the conditions that necessitate[d] foster care, and in the [Children's] best interest."

Under the initial permanency plan, Mother's relevant responsibilities and requirements were to (1) pay child support in the amount of $50 per month, (2) participate in supervised visitation with the Children, (3) undergo random drug screens, (4) undergo a drug and alcohol assessment and follow all resultant recommendations, (5) resolve any legal issues, (6) undergo a mental health assessment and follow all resultant recommendations, (7) complete domestic violence classes, (8) complete parenting education, (9) cooperate with homemaker services, (10) obtain and maintain stable housing with documentation, (11) obtain and maintain stable income with documentation of employment, (12) obtain a valid driver's license and insurance with documentation, and (13) execute necessary releases of information to DCS. The court specifically found that DCS was "making reasonable efforts toward finalizing the permanency goals." The plan reflected that the parents were residing in a two-bedroom apartment and that Mother was employed at a Waffle House restaurant.

In the interim between ratification of the first and second permanency plans, the trial court conducted a review hearing on July 11, 2017, entering an order, *inter alia*, granting to the parents four hours of weekly unsupervised day visitation in a public place with Serenity, Azaiah, and Lyriq. Following a subsequent review hearing, the trial court determined in an order entered September 14, 2017, that the parents were in "substantial compliance" with the initial permanency plan. Finding that "[v]isitation [had] gone well with no concerns noted," the court expanded the parents' unsupervised day visitation with Serenity, Azaiah, and Lyriq to eight hours and authorized DCS and the guardian *ad litem* ("GAL") to modify this visitation to overnight. The court also authorized DCS and the GAL to modify the parents' visitation with Hezeki to unsupervised. However, following a judicial review hearing conducted on December 12, 2017, the trial court found in its related order that the parents "still need housing & transportation."

A second permanency plan was established on September 28, 2017, and ratified by the trial court on February 13, 2018. Mother and her counsel were again present during the hearing, and Mother indicated through her signature that she had participated in the plan's development. Mother's requirements and responsibilities under this revised plan

3

remained essentially as under the initial plan with the added requirement, as relevant to this appeal, that Mother participate in specialized parenting training related to Hezeki's special needs. The plan also set forth an additional "action step" that the parents would "have a transportation plan in place until they obtain[ed] their licenses."

In its order ratifying the second permanency plan, the trial court directed that the goal of "Exit Custody [with] Relative" be added as a secondary goal to the primary one of "Return to Parent." The court again found that the services provided and requirements for the parents were reasonably related to the goals of the permanency plan and that DCS had been "making reasonable efforts toward finalizing the permanency goals." However, the court determined that Mother was in only "partial compliance" with the initial plan because she still needed to complete tasks. As to the requirement of random drug screens, the court ordered the parents to undergo "hair follicle/nail bed tests within 10 days of notification by DCS that funding is available." The permanency plan reflected that Mother and Father were by that time residing in Chattanooga, Tennessee, but were still seeking permanent housing. Mother had completed domestic violence and anger management education through Omni Community Health and had completed a "STOP" substance abuse program and mental health assessment through Ridgeview Behavioral Health Services. The plan indicated that Mother had not yet signed a release allowing the results of the mental health assessment to be submitted to DCS and that Mother had not obtained a valid driver's license or insurance. At the time of the plan's development, Mother reported employment at an IHOP restaurant in Chattanooga.

The third permanency plan was developed on February 7, 2018, and ratified by the trial court on June 12, 2018. Mother and her attorney were present for the hearing, and the trial court noted that Mother was "in agreement with the plan." The balance of relevant responsibilities and requirements for Mother remained the same as in the previous two plans, and the court again found these responsibilities to be reasonably related to remedying the conditions that necessitated foster care. This third plan provided for the parents to participate in unsupervised visitation with Serenity, Azaiah, and Lyriq, while maintaining supervised visitation with Hezeki. In the trial court's order ratifying the plan, the court directed that the parents "need[ed] to confirm visits 24 hours in advance and need[ed] to arrive 30 minutes early." The court again found Mother to be in "partial compliance" with the permanency plans. Due to concerns that the parents had not maintained stable housing or regular contact with DCS, requirements were added to this plan for the parents to provide proof of weekly housing applications and maintain weekly contact with DCS. Upon DCS's concerns over the possible continued use of illegal substances by both parents, the trial court approved an added requirement for the parents to submit to hair follicle or nail bed drug screens.

Following a hearing, the trial court entered a judicial review order on April 12, 2018, finding as to Mother that she was "not in substantial compliance in that she need[ed] a new [alcohol and drug] assessment, employment, housing, and transportation." The court noted that Mother had failed to appear at the review hearing but was represented by counsel. In its final termination order, the court stated that it had ordered the parents during this April 2018 judicial review "to complete new alcohol and drug assessments due to positive results on the hair follicle drug screens."

The fourth permanency plan was established on May 21, 2018, and ratified by the trial court on August 23, 2018. Mother and her counsel were again present for the hearing concerning this plan. The parents' responsibilities and requirements remained essentially unchanged under this final plan, and the court again found them to be reasonably related to the conditions that necessitated foster care. In its order ratifying the fourth plan, the trial court found that Mother was "not in substantial compliance in that she need[ed] to complete recommendations from new assessments." The court approved the addition of the secondary goal of "Adoption" in this plan while noting that Mother had participated in the development of the plan and was in agreement with all but the secondary goal. The court again found that DCS had made reasonable efforts toward the permanency goals.

In the meantime, on July 11, 2018, DCS had filed its petition to terminate the parental rights of Mother and Father, alleging, as to both parents, statutory grounds of substantial noncompliance with the permanency plans and failure to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children. Specifically as to Mother, DCS also alleged statutory grounds of abandonment by failure to visit the Children during the four months preceding the filing of the termination petition and persistence of the conditions leading to the Children's removal from Mother's home. As to Father, DCS separately alleged the statutory ground of abandonment by conduct exhibiting a wanton disregard for the Children's welfare prior to his incarceration. The trial court appointed counsel to represent each parent and attorney Matthew A. Birdwell as guardian *ad litem* for the Children.

The trial court conducted a bench trial on October 30, 2018. Mother did not personally appear for trial. At the beginning of trial, Mother's counsel requested a continuance upon informing the trial court that Mother intended to surrender her parental rights but was residing in Alabama and was unable to be in court that day. DCS's counsel objected, stating that Mother had expressed a desire to surrender her rights since approximately August 23, 2018, the date of the fourth permanency plan hearing, but had not done so to date. The court denied Mother's motion to continue, finding in its final order that Mother "was aware of this date's proceedings and had ample opportunity to execute a surrender or appear on this date and she failed to do so." As relevant to

Mother, DCS presented testimony during trial from Ms. Baird of DCS; Foster Mother; and Jessica Vineyard of the Helen Ross McNabb Center, who was the foster care manager for the Children. Father and Father's sister also testified.

In its final order, entered on January 18, 2019, the trial court determined that grounds existed to terminate the parental rights of both parents. The court found by clear and convincing evidence that both parents had failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans and had failed to manifest an ability and willingness to personally assume physical and legal custody of or financial responsibility for the Children. Specifically as to Mother, the court also found that she had abandoned the Children by failing to visit them during the applicable statutory time period and that the conditions leading to removal of the Children from Mother's home persisted. As to Father, the court found that he exhibited conduct prior to his incarceration demonstrating wanton disregard for the Children's welfare. The court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the Children. Mother timely appealed.

## II. Issues Presented

On appeal, Mother presents five issues, which we have restated slightly as follows:

1. Whether the trial court erred in finding by clear and convincing evidence that Mother abandoned the Children by failing to visit them.

2. Whether the trial court erred in finding by clear and convincing evidence that Mother was substantially noncompliant with the permanency plans.

3. Whether the trial court erred in finding by clear and convincing evidence that the conditions leading to the Children's removal from Mother's custody persisted.

4. Whether the trial court erred in finding by clear and convincing evidence that Mother had failed to manifest an ability and willingness to personally assume custody of or financial responsibility for the Children.

5. Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental

parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In addition, as our Supreme Court has explained, this Court is required "to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 525.

IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2019) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of four statutory grounds to terminate Mother's parental rights: (1) abandonment through failure to visit the Children, (2) substantial noncompliance with the reasonable requirements of the permanency plans, (3) persistence of the conditions leading to the Children's removal from Mother's custody, and (4) failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children. We will address each statutory ground in turn.

A. Abandonment by Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2019) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1) (Supp. 2019) provides in relevant part:

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or

9

have failed to support or have failed to make reasonable payments toward the support of the child; . . .

The trial court found that clear and convincing evidence demonstrated Mother's failure to visit upon the court's finding that Mother had engaged in only token visitation with the Children during the statutory period. The four-month determinative period for purposes of determining abandonment by failure to visit began on March 11, 2018, and concluded on July 10, 2018, the day prior to the filing of the termination petition. *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing)).

In its final order, the trial court specified the following, in pertinent part, regarding the statutory ground of failure to visit the Children:

> In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), -102 (1)(C) and -102(1)(E), the Court finds that there is clear and convincing evidence that [Mother] failed to visit the children in the four months prior to the filing of the Petition to Terminate Parental Rights. The Petition to Terminate Parental Rights was filed on July 11, 2018. In the four months prior to the filing of that Petition, the mother visited with Hezeki on April 10, 2018. In those same four months, the mother visited with Serenity, Azaiah and Lyriq two times, on March 30, 2018 and on April 4, 2018. The Court finds [that] these visits were token in nature given the circumstances of the mother. There has been no evidence that the mother was incapacitated or otherwise unavailable during those four months. The mother was aware that she had a responsibility to visit the children. The mother signed [DCS's] Criteria and Procedures for Termination of Parental Rights form on April 17, 2017 and again on February 9, 2018. This form included an explanation that a failure to visit the children could be used as a ground to terminate the mother's parental rights to the children.

The trial court therefore found by clear and convincing evidence that Mother's two visits with three of the Children and one visit with the fourth child during the determinative period constituted token visitation. Upon careful review, we agree with this conclusion.

Mother does not dispute the trial court's findings concerning the number of times she visited the Children during the determinative period, nor does she specifically take issue on appeal with the trial court's determination that these visits constituted token

10

visitation. At the outset, we note that we have considered the trial court's finding regarding token visitation and discern no error in this regard. Concerning token visitation, Tennessee Code Annotated § 36-1-102(1) provides in relevant part:

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

* * *

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation.

*See In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010) ("Whether visitation is 'token' under this definition is a fact-intensive inquiry to be decided on a case-by-case basis.").

In this case, Mother's two visits with Serenity, Azaiah, and Lyriq during the determinative period took place under Foster Mother's supervision on March 30, 2018, and April 4, 2018, and her one visit with Hezeki during the determinative period took place on April 10, 2018, at Hezeki's school. Mother did not visit any of the Children again between April 10, 2018, and the filing of the termination petition three months later on July 11, 2018. Considering the circumstances of this case, we conclude that the evidence does not preponderate against a finding that Mother's one or two visits with each of the Children during the determinative period were "of such an infrequent nature . . . as to merely establish minimal or insubstantial contact" with the Children. *See* Tenn. Code Ann. § 36-1-102(1)(C); *see, e.g., In re Audrey S.*, 182 S.W.3d at 867 (concluding that the mother's one or two visits with the children in the four months preceding the mother's incarceration were "nothing more than token visitation").

Citing the prior version of the statute, Mother rests her argument on her assertion that the trial court erred in finding her failure to visit to be willful. However, effective July 1, 2018, the General Assembly amended Tennessee Code Annotated § 36-1-102(1) to render the absence of willfulness to be solely an affirmative defense for cases filed as of the amendment's effective date. *See* 2018 Tenn. Pub. Acts, Ch. 875, § 2 (H.B. 1856). Inasmuch as the termination petition in the instant action was filed on July 11, 2018, the amendment eliminating "willfully" from this definition of statutory abandonment applies, *see id.*, as does the following statutory subsection added by the amendment:

11

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019).

The record indicates that Mother filed no responsive pleadings, and during trial, Mother's counsel waived both opening and closing arguments. Mother failed to personally appear for trial, and her counsel called no witnesses. It is therefore clear that Mother has raised the affirmative defense of lack of willfulness for the first time on appeal. *See Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 233 (Tenn. Ct. App. 2019) (quoting *ADT Sec. Servs., Inc. v. Johnson*, 329 S.W.3d 769, 778 (Tenn. Ct. App. 2009) ("Failure to ple[a]d an affirmative defense generally results in a waiver of the defense."). However, DCS in the termination petition alleged as to this ground that Mother had "abandoned the children because she willfully [had] not visited or [had] made only token visits in the four months before this petition was filed." In addition, DCS has addressed Mother's argument concerning lack of willfulness on appeal without raising the specter of waiver. Considering also the testimony offered by DCS as to Mother's failure to visit and the trial court's findings concerning Mother's knowledge of the consequences of her failure to visit, we determine that the affirmative defense of lack of willfulness was tried in this case by implied consent. *See* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

We emphasize that under the applicable version of the statute, the burden of proof for this affirmative defense is upon Mother. *See* Tenn. Code Ann. § 36-1-102(1)(I); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019) ("Under Tenn. Code Ann. § 36-1-102(1)[(I)], willfulness is an affirmative defense; thus, the burden is upon [the parent] to establish that his failure to visit was not willful."). As this Court has previously explained:

> Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it

12

consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d [636,] 640 [(Tenn. 2013)] (citing *In re Adoption of A.M.H.*, 215 S.W.3d [793,] 810 [(Tenn. 2007)] (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014).

Mother argues that her failure to visit the Children was not willful because of her ongoing struggles obtaining transportation, including an automobile accident that caused her to lose the use of a vehicle, the repossession of another vehicle, her lack of a driver's license throughout the time the Children were in protective custody, and the distance between her residences and the Children's placements, particularly Hezeki's placement at school in Columbia, Tennessee. Mother's citations to the record in support of these points are to Ms. Baird's testimony and to the trial court's factual findings in its final judgment based on Ms. Baird's testimony. After summarizing the number of times Mother had visited the Children during the determinative period, the trial court stated in pertinent part:

> Testimony from [Ms.] Baird indicated that the parents' transportation continued to be an issue after [they] moved back to Clinton, with their primary vehicle being damaged in an accident and another vehicle being repossessed.

Ms. Baird acknowledged that prior to the determinative period, the parents had been granted four hours of unsupervised visitation with Serenity, Azaiah, and Lyriq in July 2017. It is undisputed that up until September 2017, the parents' visits with Serenity, Azaiah, and Lyriq had been fairly consistent with appropriate parent-child interaction. As to Hezeki, staff of his school had asked that his visits with the parents be conducted at their facility. Ms. Baird's testimony and an affidavit executed by Ms. Baird reflected that the parents utilized a "gas card" from DCS to visit Hezeki at his school in Columbia once in July 2017 and that the parents were able to visit Hezeki again in Lebanon, Tennessee, once in September 2017. Ms. Baird further testified, however, that according to DCS policy, the parent must provide receipts for the gasoline used in order to obtain additional gas cards. According to Ms. Baird, Mother and Father provided a receipt the first time they used a gas card but not the second time in September 2017, and DCS was therefore unable to provide another gas card.

13

Ms. Baird acknowledged that while the parents were living in Chattanooga, they had been employed and that because they were on different work schedules, traveling to visit the Children became more problematic. It is undisputed that Foster Mother's home, where Serenity, Azaiah, and Lyriq were placed, was in Lenoir City, Tennessee, and was approximately an hour's drive from Chattanooga. Ms. Baird testified that Hezeki's school was located at least a three hours' drive from the parents' residence, although it is not clear from the record to which residence she was referring. As the trial court noted in its final order, Father "reported that [the parents] had expenses, gas and a lot of court fines to pay" when they were living in Chattanooga. Father also stated that Mother "got into a wreck and it took [them] a while to obtain another vehicle." Testimony demonstrated that the parents then left Chattanooga to return to Anderson County in January to February 2018.

Ms. Baird and Father each respectively testified that the parents had become homeless at some point in February 2018 after they left Chattanooga and returned to Anderson County. Ms. Baird's records of visitation in her affidavits, presented as exhibits at trial, indicated that the parents visited with Serenity, Azaiah, and Lyriq twice at Christmastime in December 2017 and once on January 20, 2018. Ms. Baird had noted in her affidavit that for all of the parents' other scheduled visits with the Children between January 20, 2018, and March 30, 2018, the parents had either cancelled or "did not show." Ms. Baird testified that the parents' visitation was changed from unsupervised to supervised again on March 14, 2018, when the parents each respectively failed a drug screen. Father was arrested in March 2018 and again in May 2018 and remained incarcerated through the time of trial. Testimony indicated that by June 2018, the parents had separated from each other. Ms. Baird also testified that at some point prior to trial, Mother reported to Ms. Baird that she had relocated to Alabama but had not provided an Alabama address to DCS or explained the reason for the move.

In support of Mother's defense that her failure to visit the Children during the determinative period was not willful because of her transportation obstacles, Mother relies on this Court's decision in *In the Matter of A.D.A.*, 84 S.W.3d 592 (Tenn. Ct. App. 2002). We determine *A.D.A.* to be highly factually distinguishable from this action. In *A.D.A.*, this Court reversed the trial court's finding that the mother had willfully failed to visit the child upon finding that the mother's ability to visit had been hampered by three elements, one of which was "her lack of access to transportation." *In the Matter of A.D.A.*, 84 S.W.3d at 598. This Court also determined that the mother had spent a month of the four-month determinative period in a voluntary drug rehabilitation inpatient program, "attempt[ing] to address her drug addiction" and that the mother had testified to scheduled visits with her child having been cancelled by the foster family. *Id.* The *A.D.A.* Court also considered the guardian *ad litem's* testimony concerning the mother's

14

efforts in determining that the trial court's finding as to this statutory ground should be reversed. *Id.*

In contrast, and as the trial court found, Mother in this case has presented no evidence that she was "incapacitated or otherwise unavailable during those four months" preceding the filing of the petition. Instead, Mother has relied on the testimony of others that she was without a vehicle or a driver's license. However, Mother failed to present any evidence that she had attempted to obtain a driver's license or secure other means of transportation to visit the Children. Mother does not dispute that she failed to present to DCS a transportation plan for alternate means of transportation, which the second permanency plan and all subsequent plans required her to have in place until she obtained a driver's license. Mother also presented no evidence to dispute Ms. Baird's testimony that the parents had lost the ability to rely on DCS to provide a gas card because they had failed to return a receipt for the second gas card they had been issued. Mother has not carried the burden of proof to demonstrate the affirmative defense of lack of willfulness in her failure to visit the Children during the determinative period.

We conclude that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother failed to visit the Children during the determinative period. The trial court did not err in terminating Mother's parental rights to the Children based upon this statutory ground.

### B. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Mother failed to substantially comply with the statement of responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2)     There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as to Mother as follows:

> In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that the parents . . . failed to substantially comply with the requirements of the permanency plans ratified and made orders of this Court. The first permanency plan developed by DCS on April 17, 2017 was ratified on May

15

23, 2017. The first permanency plan was signed by the mother on the date of development and [Ms.] Baird arranged for the father to participate in the development of the plan by telephone from jail. The permanency plan required the parents to visit the children and pay child support; submit to random drug screens; complete alcohol and drug and mental health assessments and follow all resulting recommendations; complete domestic violence classes; complete parenting classes; cooperate with homemaker services; provide proof of housing, income, and transportation including valid licenses and insurance; resolve legal issues/comply with probation; and execute releases of information necessary for DCS to monitor compliance with the plan.

The permanency plan was revised on September 28, 2017. The second plan reiterated the requirements in the first plan and added a requirement that the parents participate in specialized parenting training for Hezeki, who had been diagnosed with autism and placed . . . [in] a residential treatment facility for children with autism. The second plan was ratified by the Court on February 13, 2018. Both parents were present in Court on that date. The Court ordered the parents to submit to hair follicle or nail bed drug screens within 10 days of notification by DCS that funding was available.

Prior to this date, the plan had been revised again on February 7, 2018. The third plan reiterated the requirements in the first two plans and added requirements that the parents submit to hair follicle or nail bed drug screens; put in weekly housing applications and provide proof to DCS; and maintain weekly contact with DCS. On April 12, 2018, the Court held a judicial review and ordered the parents to complete new alcohol and drug assessments due to positive results on the hair follicle drug screens. The third plan was then ratified on June 12, 2018.

The plan was again revised on May 21, 2018 and a goal of adoption was added. No changes were made to the parent[s'] responsibilities on the fourth plan, which was subsequently ratified by the Court on August 23, 2018.

The Department made reasonable efforts to assist the parents in this matter. DCS referred the parents for mental health and alcohol and drug assessments; referred the parents for domestic violence and parenting classes; referred homemaker services to the family; provid[ed] housing resources and gas cards for transportation assistance; provided therapeutic

16

supervised visitation; and made diligent efforts to maintain contact with the parents and give them advice and recommendations.

After the children entered DCS custody, the parents began to work with the Department. They initially completed parenting classes and domestic violence classes. They completed mental health and alcohol and drug assessments in 2017 and complied with all resulting recommendations, however they continued to use illegal drugs. The parents moved from Clinton to Chattanooga and back to Clinton during the pendency of this case. On April 12, 2018, the Court held a judicial review and ordered the parents to complete new alcohol and drug assessments after the parents tested positive for illegal drugs on hair follicle drug screens. The parents have not completed any specialized training to address Hezeki's special needs. They have not maintained consistent contact with the children or the Department. They have not maintained safe and stable housing, income or transportation. The mother has recently moved to Alabama but has not provided DCS with an address and has indicated that she would like to surrender her parental rights. . . . Although the parents did complete some of the requirements of the permanency plans, they have not been able to substantially comply with those requirements. The parents have not addressed the concerns which led to the removal of the children— environmental neglect and incarceration.

Upon thorough review, we determine that a preponderance of the evidence supports the trial court's findings that Mother failed to substantially comply with what we determine to be the reasonable responsibilities of her permanency plans.

DCS has acknowledged on appeal that the trial court in its final order "did not make an explicit finding that Mother's responsibilities under the permanency plans were reasonably related to remedying the conditions that warranted foster care for the children." As our Supreme Court has explained:

A trial court must find that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). We hold that this finding must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2).

Because the trial court made no finding regarding the reasonableness of [the parent's] responsibilities under the permanency plans, our review of this issue is de novo.

17

*In the Matter of Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).[2] Accordingly, as in *Valentine*, our review of the reasonableness of Mother's responsibilities under the permanency plans is *de novo* in this case. *See id.*

We note that although not a substitute for making this finding in the final judgment, the trial court did find in each of its orders respectively ratifying the four permanency plans that the requirements and responsibilities set forth for Mother were "reasonable, related to remedying the conditions that necessitate[d] foster care, and in the [Children's] best interest." As DCS notes, the trial court also in its final judgment found that in failing to substantially comply with the permanency plans, the parents had "not addressed the concerns which led to the removal of the children—environmental neglect and incarceration." As to Mother, the specific concern at the time of the Children's removal and to which Mother stipulated in the dependency and neglect action was environmental neglect. In its order authorizing the removal of the Children from the home, the trial court listed the reasons as "environmental neglect and truancy." In addition, Father's incarceration was based on drug-related charges, indicating legitimate concerns regarding potential illicit drug use in the home. As DCS points out and Mother does not dispute, the initial petition filed by DCS for protective supervision of the Children indicated that the referral for investigation into the home also alleged that the Children had witnessed domestic disputes between the parents. Upon review, we determine that the requirements and responsibilities set forth for Mother in the permanency plans were reasonably related to remedying the conditions that led to removal of the Children.

On appeal, Mother argues that the trial court erred by finding her in substantial noncompliance with the permanency plans because the court found that Mother had not complied with a requirement as to parenting Hezeki that had not actually been included in her plan responsibilities and failed to give full credit to Mother for the requirements she did accomplish. Concerning the trial court's finding that Mother had "not completed any specialized training to address Hezeki's special needs," Mother asserts that no action step was ever added to a permanency plan requiring such specialized training. We disagree. In the second permanency plan, under the "Desired Outcome" of both parents' need to

---

[2] Tennessee Code Annotated § 37-2-403(a)(2)(C) (Supp. 2019) provides in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

learn and demonstrate "age appropriate parenting skills," the following action step was added for Mother and Father in addition to the responsibility of completing parenting education that had been in the first permanency plan:

> [Hezeki's school] [is] willing to work with both parents on training regarding Hezeki to effectively parent Hezeki and his special needs. [Hezeki's school] will put together a packet for the parents.

Mother also asserts that Ms. Baird offered conflicting testimony during trial as to whether an action step was added to any of the permanency plans concerning Hezeki. The two exchanges cited by Mother were as follows:

| | |
|---|---|
| DCS's Counsel: | Were there ever any actions set, financial plans, particularly regarding Hezeki? |
| Ms. Baird: | Just to participate and work with the facility on the specialized care given to him. |
| DCS's Counsel: | What was the reason for that? |
| Ms. Baird: | To tell the parents like his structure that he's going through and to help him continue with the process that he's going through now. Any steps that they could help with the parents on parenting Hezeki. |

* * *

| | |
|---|---|
| DCS's Counsel: | Have the parents participated in any specialized parenting and education for Hezeki? |
| Ms. Baird: | Not that I'm aware of, no. |

We find no contradiction in this testimony or in the trial court's finding concerning the reasonable requirement of obtaining training in parenting Hezeki due to his special needs. Whether the specialized training available consisted of a class, a packet of information to review, or simply a session or sessions with staff at Hezeki's school, Mother does not dispute the trial court's finding that she failed to pursue such training as was available to her at the facility where Hezeki was placed.

Mother also argues that the trial court failed to give proper credit to her for the requirements and responsibilities with which she did comply. To the contrary, the trial

court expressly found in its final order that Mother had initially completed parenting classes and domestic violence classes as well as mental health and drug and alcohol assessments in 2017 while also following the resultant recommendations. The court further found, however, and Mother does not dispute, that she subsequently failed a drug screen and required a second alcohol and drug assessment. Mother notes that she also had initially complied with homemaker services and that she had "at various times provided both proof of employment and income."[3]

The problem with Mother's argument in this regard is that the overall goal of the reasonable responsibilities in Mother's permanency plans was to remedy the reasons for the Children's removal. *See* Tenn. Code Ann. §§ 36-1-113(g)(2), 37-2-403(a)(2)(C) (Supp. 2019). The fact that Mother "at various times" during the period that the Children were in protective custody demonstrated that she was employed does not remedy what the trial court found to be substantial noncompliance with the requirements of demonstrating stable income, safe and stable housing, and transportation. Mother asserts that at the time of trial, she "was working 'diligently' to secure stable housing, income and transportation when her parental rights were terminated." Mother, however, presented no evidence at trial of having obtained stable housing, income, or transportation.

Moreover, as the trial court found, Mother by the time of trial had neither communicated her new address in Alabama nor any information regarding her current housing and employment situation to DCS. Mother had also failed to consistently visit or even communicate with the Children since at least April 2018. Considering the totality of the evidence, we determine that the trial court did not err in terminating Mother's parental rights upon clear and convincing evidence of the statutory ground of failure to substantially comply with the permanency plans.

### C. Persistence of Conditions Leading to the Children's Removal

The trial court further found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children from Mother's home. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (Supp. 2019) provides:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a

---

[3] Mother states on appeal that "on February 13, 2018 the parents were found in substantial compliance with the permanency plan." We note, however, that in its February 13, 2018 order ratifying the second permanency plan, the trial court actually determined that Mother was in only "partial compliance" with the initial plan because of the tasks she still needed to complete.

20

court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

(B)    The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

In this case, pursuant to Tenn. Code Ann. [§] 36-1-113(g)(3), the Court finds that there is clear and convincing evidence that the conditions which led to the removal of the children persist to this date. The children were removed from the mother's home on March 30, 2017. On that date the Court entered a Bench Order of Custody to DCS as to these children, after the Department filed a *Petition for Order Controlling Conduct and for Protective Supervision*. The Court bench ordered the children into DCS custody and found probable cause that the children were dependent and neglected due to environmental neglect and truancy. The mother later waived her right to an adjudicatory hearing and stipulated to environmental neglect.

The children have been in DCS custody for nineteen months. As of this date, the mother has not maintained safe and stable housing to which the children can return. The mother has moved from Clinton to Chattanooga and back to Clinton during the pendency of the case. She has

resided with others and is currently reporting that she has moved to Alabama, although she has not provided DCS with an address. The mother has resided in at least four different homes since the children entered custody.

There is little chance that the conditions which led to the removal of the children will be remedied soon so that the children can be returned safely to the home, because for nineteen months, DCS has made reasonable efforts as set forth above to help the mother to remedy them. Those efforts have been fruitless and the mother has reported a desire to surrender her parental rights. Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home.

Upon careful review, we further determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground.

As the trial court noted, its order removing the Children from Mother's home and physical custody was entered on March 30, 2017, approximately sixteen months before the termination petition was filed and nineteen months prior to trial. In its order removing the Children, the trial court found probable cause that the Children were dependent and neglected as to Mother based on environmental neglect and truancy. An order adjudicating the Children dependent and neglected as to both parents was entered on May 23, 2017, and as to Mother, upon her stipulation to "environmental neglect in the home."

In her argument concerning this ground, Mother focuses on the specific circumstances for which the initial referral to DCS was made, which Mother summarizes as:

reports that the home . . . was dirty, cluttered and without much furniture; reports by [Serenity] that there was not enough food in the house and that [Hezeki] was not enrolled in school; and observations by [a child protective services] investigator that a person . . . who had prior dealing with [DCS] was watching the children while [Mother] was at work.

Mother then relies on her completion of parenting classes, domestic violence classes, STOP program for substance abuse, and work with counseling and homemaker services to assert that she had pursued the training and skills necessary to prevent environmental neglect in the future.

Although we recognize, as did the trial court, Mother's early efforts to complete several types of required training, Mother has not demonstrated at any point during the time that the Children have been in protective custody her ability to maintain a stable home. Having changed residences several times and, at the time of trial, having failed to provide information on her most recent residence in Alabama, Mother was further unable to demonstrate that she could provide a home absent of the environmental neglect that initially caused the Children to be removed from her custody.

Moreover, as DCS points out, this statutory ground also applies when conditions other than those for which the Children were removed "exist that, in all reasonable probability, would cause the child[ren] to be subjected to further abuse or neglect, preventing the child[ren]'s safe return to the care of the parent or guardian." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *see, e.g.*, *In the Matter of S.Y., J.Y., & D.Y.,* 121 S.W.3d 358, 370-71 (affirming the trial court's finding of persistent conditions wherein the mother had corrected certain immediate conditions leading to the children's removal but had failed to address underlying "other conditions" that were reasonably probable to lead to the children living in a condition of neglect similar to that prompting their removal if they were returned to the mother).

At the time of trial, Mother had ceased to maintain consistent communication with DCS and had provided no documentation of her current living situation or income that would have allowed her situation to be investigated for environmental safety. Mother also did not appear at trial and, although represented by counsel, presented no evidence of having obtained and maintained a safe living environment for the Children. Mother now argues that "provided time enough," she would be able to do so. We, however, must agree with the trial court that given the totality of the evidence in this case, "[t]here is little chance that the conditions which led to the removal of the children will be remedied soon[.]"

We determine that the evidence demonstrated that continuation of the parent-child relationship between Mother and the Children would greatly diminish the Children's chances of integration into a safe, stable, and permanent home. We conclude that the trial court properly terminated Mother's parental rights based on clear and convincing evidence of this statutory ground as well.

### D. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Children

The trial court also found clear and convincing evidence to support termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2019), which provides as an additional ground for termination:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

In the instant action, the trial court found as follows regarding this statutory ground as to Mother:

> In this case, pursuant to Tenn. Code Ann. [§] 36-1-113(g)(14), the Court finds that there is clear and convincing evidence that the parents . . . have failed to manifest an ability and willingness to assume legal and physical custody of these children. The children have been in DCS custody for nineteen months. . . . The mother has recently reported that she has moved to Alabama but has failed to provide DCS with an address. The parents have not demonstrated the stability needed to provide a safe home for the children.
>
> Placing the children in the legal and physical custody of either parent would pose a risk of substantial harm to the physical and/or psychological welfare of the children. After the children entered DCS custody, Hezeki was diagnosed with autism. The parents have failed to maintain regular contact with Hezeki, participate in his treatment plans, or educate themselves of parenting techniques to address this diagnosis.
>
> * * *
>
> Both the parents have continued to have substance abuse issues and tested positive for illegal drugs on hair follicle drug screens. The parents' failure to maintain sobriety greatly affects their ability to provide a safe and stable home for the children.

This Court has recently explained the following with regard to this ground for termination of parental rights:

> Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in

24

[the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

* * *

We have made the following observations about what constitutes "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted).

This Court has also previously held that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child. *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018); *but see In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (reversing this ground for termination when parents were unable but had demonstrated willingness to assume custody and financial responsibility of their children). A parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, 2018 WL 3058280, at *15.

Regarding the first prong in the instant action, the trial court found that DCS had proven by clear and convincing evidence that Mother had not manifested an ability and

willingness to personally assume legal and physical custody of the Children or financial responsibility for the Children. The trial court specifically found that Mother had not demonstrated the ability and willingness to establish "the stability needed to provide a safe home for the children," given her repeated changes of residence, lack of communication with DCS concerning her most recent relocation to Alabama, lack of documentation concerning her current income and living situation, continued history of testing positive for illegal substances on her most recent drug screen, and failure to seek training to parent a child with Hezeki's special needs.

Mother again argues that the trial court failed to adequately consider her positive progress early in the pendency of this case. As explained in the two preceding sections of this opinion, we disagree, having determined that the trial court properly considered Mother's early progress but also could not ignore Mother's failure to follow through on the tasks she needed to accomplish in order to manifest an ability and willingness to assume legal and physical custody of and financial responsibility for the Children.

The second prong of this statutory ground requires DCS to prove by clear and convincing evidence that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the Children's physical and psychological welfare. The trial court found clear and convincing evidence of this prong based on its findings that Mother would be unable to care for the Children in a safe and stable home, that she had been unable to demonstrate that she would remain unimpaired by substance abuse, and in particular as to Hezeki, that Mother had been unable to demonstrate that she could adequately attend to his special needs.

Based on the foregoing, the trial court found that DCS also had met its burden regarding this prong. Upon careful review of the record, we agree. The evidence does not preponderate against the trial court's finding that placing the Children into Mother's custody would pose a risk of substantial harm to the Children's physical and psychological welfare. Accordingly, we affirm the trial court's determination by clear and convincing evidence regarding this statutory ground for termination of Mother's parental rights.

V. Best Interest of the Children

Mother contends that DCS did not present sufficient evidence to support the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the Children. We disagree. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington*

*H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'" (quoting *In re Angela E.*, 303 S.W.3d at 254)). Tennessee Code Annotated § 36-1-113(i) (Supp. 2019) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the

27

home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017). We note that as with other factual findings made in connection with the best interest analysis, whether DCS exerted reasonable efforts to assist Mother must be proven by a preponderance of the evidence, rather than by clear and convincing evidence. In re Audrey S., 182 S.W.3d at 861.

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Children. In its final judgment, the trial court specifically found regarding these factors as to Mother:

> In this case, the Court finds that there is clear and convincing evidence that termination of the parental rights of [Mother] and [Father] is in the best interest of the children as follows:
>
> 1.    [Mother] and [Father] have not made changes in their conduct or circumstances that would make it safe for the children to go home. . . . Both parents have failed to maintain sobriety. Neither parent has obtained and maintained safe and stable housing, nor have they visited regularly with the children.

2. [Mother] and [Father] have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state for nineteen months, the parents have not demonstrated the stability necessary to provide a safe, stable and permanent home for these children.

3. [Mother] and [Father] have not maintained regular visitation with the children.

4. Changing caregivers at this stage of [the Children's] lives will have a detrimental effect on them. The children have stability in foster care and the hope of a permanent adoptive home.

5. [Mother] and [Father] have neglected the children by using illegal drugs and participating in criminal activity.

6. There is crime in the parents' home.

7. [Mother] and [Father] abuse drugs, rendering them consistently unable to care for the children in a safe and stable manner.

8. [Mother] and [Father] have shown little interest in the welfare of the children.

9. Specifically as to Hezeki, it is in the child's best interests for termination to be granted, because the parents have not participated regularly in his treatment plans or educated themselves on his diagnosis.

10. The children have made great strides while in foster care and they deserve permanency.

The trial court also considered a recommendation from the guardian *ad litem* that it would be in the Children's best interest to terminate Mother's parental rights.

The trial court expressly found that the following factors weighed against maintaining Mother's parental rights to the Children: factor one (whether Mother has made an adjustment of circumstance, conduct, or conditions), factor two (whether Mother has effected a lasting adjustment after reasonable efforts made by DCS), factor three

(whether Mother has maintained regular visitation or other contact), factor five (the effect a change of caretakers and physical environment would have on the Children), factor six (whether Mother has shown neglect toward the Children), and factor seven (whether the physical environment of Mother's home is healthy and safe). *See* Tenn. Code Ann. § 36-1-113(i).[4] The court also found in its final order that DCS had made reasonable efforts in offering its assistance to Mother throughout the pendency of this case, and Mother has not disputed this finding.

Additionally, we determine that the trial court's finding that Mother had not maintained regular visitation or other contact with the Children implicated the deterioration of a meaningful bond between Mother and the Children, particularly Hezeki (factor four). *See id.* The trial court further found that Mother had "shown little interest in the welfare of the Children," implicating to some extent Mother's mental or emotional status that would prevent her from effectively parenting the Children (factor eight). *See id.* We note that despite undisputedly having notice of the termination trial, Mother failed to personally appear on the day of trial and sent word through her counsel that she intended to surrender her parental rights, which Ms. Baird testified Mother had also indicated to her following the August 2018 permanency plan hearing. The record gives no further indication of the reasons for Mother's expressed wish to surrender her parental rights and subsequent change of heart, but at the least, her failure to appear without documentation of the reasons for such failure, other than her out-of-state residence, is indicative of a pattern of instability that further implicates Mother's emotional readiness to safely and effectively parent the Children. *See, e.g.*, *In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *24 (Tenn. Ct. App. Nov. 28, 2018) (affirming the trial court's finding that the mother's "inability or unwillingness to appear in court exemplified a pattern of problems Mother had experienced meeting requirements throughout the time that the Children were in protective custody.").

In support of her argument that the trial court erred in finding that it was in the Children's best interest to terminate her parental rights, Mother asserts that the court failed to properly consider what had been demonstrated as a meaningful bond between Mother and the Children. Ms. Baird and Ms. Vineyard (the Children's foster care manager) did each respectively testify that Mother demonstrated appropriate parenting when visiting with Serenity, Azaiah, and Lyriq. Ms. Vineyard testified that although Mother "often would call Serenity in to help with the other two" during visits, Mother was able to manage the three siblings together and that the three siblings greeted Mother with "hugs and kisses."

---

[4] As to factor nine (whether Mother has paid child support), *see* Tenn. Code Ann. § 36-1-113(i), Mother was ordered to pay child support in the amount of $50.00 per month in the first permanency plan order. Although Father testified that he had been arrested in September 2017 on a contempt charge for failure to pay child support, Mother's history of child support payments is not clear from the record before us.

However, Ms. Baird also testified that the parents had "not been visiting and it has been hard on the children, especially Serenity, she doesn't understand why the parents aren't visiting." According to Ms. Baird, Father had been making telephone contact with the Children through the jail where he was housed but Mother had not been making telephone contact with the Children in recent months. With deep respect for the precious rights at stake here, *see In re Carrington H.*, 483 S.W.3d at 522, we nonetheless determine that the trial court properly considered the deterioration in the meaningful bond between Mother and the Children in light of all the statutory factors.

Moreover, Mother has presented no evidence to refute the trial court's finding that changing caretakers would have a detrimental effect on the Children. Ms. Baird opined that changing caretakers would be difficult for all of the Children and especially for Hezeki, whom she stated "needs to have the structure." Ms. Baird and Foster Mother each respectively acknowledged that Serenity, Azaiah, and Lyriq are not currently in a pre-adoptive home because Foster Mother would not be able to adopt Hezeki. Ms. Baird testified that DCS and Helen Ross McNabb Center staff had been searching for a pre-adoptive home for all of the Children and that a person had been identified who had provided respite care for Serenity, Azaiah, and Lyriq in the past and had expressed interest in adopting all four of the Children.

Testimony demonstrated that all of the Children had made positive progress while in protective custody. Specifically as to Hezeki's progress, Ms. Baird explained:

> When he first came in, he had a lot of speech problems and he couldn't verbalize at that time, so he was considered non-verbal. He could say key words but not many. While he's been at [his school], he's progressed. He is able to say two to three words at a time. He doesn't do the yelling and screaming. He's able to try to tell you what he wants. He uses a tablet there that also helps him—if he wants it, he can't say it. Trying to sing a song. He doesn't like click his tongue as often as he used to. The yelling and screaming, he doesn't do.

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects, including the termination of Mother's parental rights to the Children. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights and collection of costs assessed below. Costs on appeal are assessed to the appellant, Angela W.

_____
THOMAS R. FRIERSON, II, JUDGE

33